1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7    ROSHAWN RANDALL, an
     individual, and BAD DAWG, INC.,          NO. 2:23-CV-0095-TOR
8    an Idaho corporation,
                                              ORDER GRANTING DEFENDANT'S
9                          Plaintiffs,        MOTION TO COMPEL
                                              ARBITRATION
10        v.

11   FEDEX GROUND PACKAGE
     SYSTEM, INC., a Delaware
12   corporation,

13                         Defendant.

14        BEFORE THE COURT are Defendant's Motion to Compel Arbitration

15   (ECF No. 9) and Motion to Dismiss (ECF No. 10). These matters were submitted

16   for consideration with oral argument on July 19, 2023. Courtney A. Hall, Alayna

17   M. Piwonski, and Kelly E. Konkright appeared on behalf of Plaintiffs. William G.

18   Whitman, IV and Gregory M. Monaco appeared on behalf of Defendant. The

19   Court has reviewed the record and files herein, heard from counsel, and is fully

20   informed. For the reasons discussed below, Defendant's Motion to Compel

     ORDER GRANTING DEFENDANT'S MOTION TO COMPEL
     ARBITRATION ~ 1

Arbitration (ECF No. 9) is **granted** and Defendant's Motion to Dismiss (ECF No. 10) is **denied as moot**.

## BACKGROUND

On March 17, 2023, Plaintiffs filed a Complaint in Spokane County Superior Court, alleging the following causes of action: (1) race discrimination / disparate treatment; (2) intentional infliction of emotional distress; and (3) negligent infliction of emotional distress. *See id.* On April 7, 2023, Defendant removed the action to this Court. On April 28, 2023, Defendant filed the present motions, which are fully briefed. ECF Nos. 9, 10, 13, 15, 17, 20. The following facts are drawn from Plaintiffs' Complaint, which are accepted as true for purposes of the present dispute. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

Plaintiff Roshawn Randall is an Idaho citizen and Plaintiff Bad Dawg, Inc. ("BDI") is an Idaho corporation doing business in Spokane County, Washington. ECF No. 1-2 at 2, ¶¶ 1.1–1.2. Mr. Randall has been the owner of BDI since October 2019. *Id.*, ¶ 1.3. Defendant FedEx is a Delaware corporation doing business in Spokane County, Washington. *Id.* at 2–3, ¶ 1.4. FedEx employs "independent service providers" ("ISPs") who are third-party delivery service companies that deliver packages to customers. *Id.* at 3, ¶ 3.3

Prior to March 2022, BDI operated as an ISP for FedEx, providing package delivery services from a designated location to customers in contractually defined areas within Spokane County, Washington for more than twenty years. *Id.* at 3–4, ¶ 3.4. BDI and FedEx's business relationship was governed by an Independent Service Provider Agreement. *Id.* at 4, ¶ 3.5.

On or about October 3, 2020, BDI and FedEx entered into a new ISP Agreement. *Id.*, ¶ 3.6. Under the Agreement, the parties had a duty to act with fairness and in good faith in conducting their business. *Id.*, ¶ 3.7. The Agreement includes provisions setting forth BDI's exclusive right to provide transportation services for packages from a Spokane County FedEx Station to specific addresses located in the Contracted Service Area. *Id.*, ¶ 3.8.

Under Section 1.1(H), FedEx could redefine BDI's Contracted Service Area, but FedEx was required to "undertake a good faith effort to ensure that a redefined [Contracted Service Area] is reasonably comparable in terms of stops, geographic proximity (in relation to the [FedEx] Station or point(s) at which packages are tendered), and projected net contract revenue." *Id.*, ¶ 3.9.

Under Section 5 of the Attachment A-2 to Schedule A, BDI agreed to achieve a daily "Inbound Local Service" level of "at least 98.5 percent of the daily average Inbound Local Service level attained by either the [FedEx] Station or the '[FedEx] District,' whichever is higher, in each [FedEx] Station out of which BDI

provides contracted services." *Id.* at 4–5, ¶ 3.10.  The parties agreed "to conduct all business activities safely and professionally, with honesty and integrity, and in accordance with the Applicable Law, at all times." *Id.* at 5, ¶ 3.11.

Prior to October 2019, BDI was owned by a third-party and operated under the name Black Eye Enterprises, Inc.  *Id.* at 5, ¶ 3.12.  Black Eye had a nearly twenty-year relationship with FedEx, providing delivery services to FedEx as an ISP. *Id.*, ¶ 3.13.  In or around October 2019, Mr. Randall purchased Black Eye and changed the name of the company to BDI.  *Id.*, ¶ 3.14.  In doing so, Mr. Randall became the only owner of an ISP provider of FedEx operating in Spokane County, Washington and Kootenai County, Idaho who is a person of color.  *Id.*, ¶ 3.15.  All other ISP owners for FedEx in these areas are Caucasian.  *Id.*, ¶ 3.16.

Following Mr. Randall's acquisition of BDI, FedEx began to treat BDI and Mr. Randall differently than all other ISPs and their owners.  *Id.* at 6, ¶ 3.17.  At the time of Mr. Randall's purchase of BDI, the station manager for the FedEx station out of which BDI operated regularly made racially derogatory comments about people of color and specifically about Mr. Randall.  *Id.*, ¶ 3.18.  The station manager did not like Mr. Randall because of Mr. Randall's skin color.  *Id.*  The station manager told others at FedEx he was "going to go pick on BDI" on multiple occasions.  *Id.*, ¶ 3.19.  The station manager treated BDI and Mr. Randall less

1  favorably than all other ISPs and their owners/employees and this treatment

2  continued even after the station manager left FedEx.  *Id.*, ¶¶ 3.20, 3.21.

3      At the end of 2021, the station manager left FedEx and a new station

4  manager was promoted.  *Id.*, ¶ 3.22.  This new station manager previously worked

5  under the former station manager and participated in the discriminatory treatment

6  of Mr. Randall and BDI.  *Id.*, ¶ 3.22.

7      Prior to Mr. Randall's purchase of BDI, FedEx made its employees at the

8  FedEx Station available to all ISPS – including BDI – for the purpose of

9  organizing and loading packages onto delivery trucks.  *Id.* at 7, ¶ 3.25.  After Mr.

10 Randall took over ownership of BDI, FedEx ceased making its employees

11 available to BDI for loading assistance and FedEx employees refused to assist

12 organize and/or load packages onto BDI's delivery trucks.  *Id.*, ¶ 3.26.  FedEx

13 continued to provide loading assistance to all other ISPs at the FedEx Station.  *Id.*,

14 ¶ 3.27.  Consequently, BDI drivers organized and loaded BDI delivery trucks

15 alone, resulting in a substantially longer loading process.  *Id.*, ¶¶ 3.28, 3.29.  BDI

16 drivers began to consistently leave the FedEx Station sixty to ninety minutes later

17 than the other ISPs that received loading assistance from FedEx.  *Id.*, ¶ 3.29.  BDI

18 drivers that left later resulted in packages not arriving on time, resulting in BDI

19 paying its employees overtime to cover the time it took to deliver packages, nearly

20 doubling its payroll.  *Id.*, ¶¶ 3.30, 3.32.  Mr. Randall and BDI made numerous

1  requests for FedEx to resume loading assistance, but FedEx either refused or

2  ignored these requests.  *Id.*, ¶ 3.31.

3       On or around January 2021, BDI's average daily "Inbound Local Service"

4  level fell below 98.5 percent.  *Id.* at 8, ¶ 3.33.  Previously, BDI consistently

5  maintained a daily level of at least 98.5 percent in compliance with the ISP

6  Agreement.  *Id.*, ¶ 3.34.

7       On or around October 2021, FedEx informed BDI that it would significantly

8  reduce BDI's Contracted Service Area and indeed reduced the Area by nearly half.

9  *Id.*, ¶ 3.35.  FedEx removed BDI's service area in downtown Coeur d'Alene and

10  Post Falls, Idaho, leaving BDI with the remaining part of the Contracted Service

11  Area which was rural and mountainous – and thus, more difficult and costly to

12  service for BDI.  *Id.*, ¶ 3.37.   As a result, BDI's performed fewer deliveries and

13  received less compensation.  *Id.*, ¶ 3.36.

14       In justifying the reduction of the Contracted Service Area, FedEx cited in

15  part to BDI's average daily Inbound Local Service Level that fell below 98.5

16  percent for a period of time.  *Id.* at 9, 3.39.  While the average daily drop could be

17  attributed to FedEx's decision to no longer provide loading assistance, BDI still

18  maintained an average daily Inbound Local Service level that was higher than

19  other ISPs in the area.  *Id.*, ¶ 3.41.  However, FedEx did not alter or significantly

20  reduce other ISPs Contracted Service Areas for this reason.  *Id.*, ¶ 3.42.

1    In the aftermath of this decision, FedEx informed BDI that it could get the

2    entire Contracted Service Area back if it raised its daily Inbound Local Service

3    level above 98.5 percent.  *Id.*, ¶ 3.43.  BDI achieved this but FedEx continued to

4    refuse to return the entire Contracted Service Area to BDI.  *Id.*, ¶ 3.44.

5    As a second reason for reducing the area of service, FedEx informed BDI it

6    was "too big" for the Contracted Service Area.  *Id.*, ¶ 3.45.  However, other ISPs

7    making deliveries were just as large or larger than BDI and these ISPs did not have

8    their Contracted Service Areas reduced.  *Id.*, ¶ 3.46.  BDI's former Contracted

9    Service Area is currently divided between other ISPs who are just as large or larger

10    than BDI, and none of which are owned by an African American.  *Id.* at 10, ¶ 3.47.

11    In the summer of 2021, BDI and FedEx began to negotiate a new contract as

12    was custom practice where the Agreement was set to expire in October 2021.  *Id.*

13    at 10, ¶ 3.48.  Negotiations stalled when FedEx demanded, among other things,

14    that BDI agree to terms that would ensure BDI's financial failure.  *Id.*, ¶ 3.49.  For

15    example, FedEx refused to return the entire Contracted Service Area to BDI under

16    the new agreement.  *Id.*, ¶ 3.50.  Additionally, FedEx insisted that BDI commit to a

17    projected net contract revenue in a new agreement that was lower than it had ever

18    been previously – all while making it more difficult for BDI to be profitable by

19    significantly reducing its Contracted Service Area and refusing to assist BDI to get

20    its trucks loaded.  *Id.*, ¶ 3.51.  FedEx extended the Agreement terms while the

parties continued to negotiate, with the last of the extensions lasting until March 2022. *Id.*, ¶ 3.52. While BDI believed a new agreement would be reached, FedEx informed BDI that it would not renew the Agreement with BDI in March 2022. *Id.*, ¶ 3.53. BDI was left with a host of expenses which it was forced to incur by FedEx pursuant to the Agreement and BDI's performance of services as an ISP. *Id.*, ¶ 3.54. FedEx's treatment was to put BDI effectively out of business as a delivery service company by FedEx. *Id.* at 11, ¶ 3.56.

## DISCUSSION

### I.    Motion to Compel Arbitration

Defendant moves to compel Plaintiffs to arbitration under the terms of the ISP Agreement. ECF No. 9. Plaintiffs oppose arbitration on several grounds. ECF No. 13. The Court addresses each issue in turn.

The Federal Arbitration Act ("FAA") makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects "both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations and quotation marks omitted). Thus, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *Id.* (internal citation omitted).

1    Generally, the court determines two threshold issues on a motion to compel

2    arbitration: (1) whether there is an agreement to arbitrate between the parties and

3    (2) whether the agreement covers the dispute.  *Brennan v. Opus Bank*, 796 F.3d

4    1125, 1130 (9th Cir. 2015).  The "party seeking to enforce an arbitration agreement

5    bears the burden of showing that the agreement exists and that its terms bind the

6    other party."  *Glow v. Cent. Pac. Mort. Corp*., 560 F. Supp. 2d 972, 978 (E.D. Cal.

7    2008).  This burden is "substantial."  *Id*. at 979.  "[T]here should be an express,

8    unequivocal agreement to that effect."  *Three Valleys Mu. Water Dist. V. E.F.*

9    *Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (citation omitted).  In

10    determining the existence of an arbitration agreement, state-law principles of

11    contract interpretation apply, and courts should give "due regard to the federal

12    policy in favor of arbitration by resolving ambiguities as to the scope of arbitration

13    in favor of arbitration."  *Wagner v. Stratton Oakmont, Inc*., 83 F.3d 1046, 1049

14    (9th Cir. 1996).  Courts view the evidence in the light most favorable to the

15    nonmoving party because an order compelling arbitration "is in effect a summary

16    disposition of the issue of whether or not there had been a meeting of the minds on

17    the agreement to arbitrate."  *Hansen v. LMB Mortgage Service, Inc*., 1 F.4th 667,

18    670 (9th Cir. 2021) (citation omitted).

19    **A.  Agreement to Arbitrate**

20    Plaintiffs contend that there is no valid agreement to arbitrate on the grounds

ORDER GRANTING DEFENDANT'S MOTION TO COMPEL
ARBITRATION ~ 9

1    that they are exempt as transportation workers and alternatively, that application of

2    the Pennsylvania Revised Uniform Arbitration Act is contrary to Washington law.

3    ECF No. 13 at 2.

4          The Federal Arbitration Act ("FAA") makes agreements to arbitrate "valid,

5    irrevocable, and enforceable, save upon such grounds as exist at law or in equity

6    for the revocation of any contract." 9 U.S.C. § 2.  The FAA reflects "both a liberal

7    federal policy favoring arbitration … and the fundamental principle that arbitration

8    is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339

9    (2011) (internal citations and quotation marks omitted).  Thus, "courts must place

10   arbitration agreements on an equal footing with other contracts … and enforce

11   them according to their terms." *Id.* (internal citation omitted).

12         In determining whether to compel arbitration, generally the court must

13   determine two threshold issues: (1) whether there is an agreement to arbitrate

14   between the parties and (2) whether the agreement covers the dispute.  *Brennan v.*

15   *Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  Here, Plaintiffs do not challenge

16   the scope of the agreement.  ECF No. 13 at 2.

17         Section 1 of the FAA exempts "contracts of employment of seamen, railroad

18   employees, or any other class of workers engaged in foreign or interstate

19   commerce." 9 U.S.C. § 1.  The exemption applies to the "performance of *work* by

20   *workers*", including independent contractors.  *New Prime Inc. v. Oliveira*, 139 S.

ORDER GRANTING DEFENDANT'S MOTION TO COMPEL
ARBITRATION ~ 10

1  Ct. 532, 541 (2019).  Transportation workers include those "employed to deliver

2  goods that originate out-of-state to an in-state destination" regardless of whether

3  the worker personally travels between states, so long as the goods remain in the

4  channel of interstate commerce.  *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 910

5  (9th Cir. 2020).  Courts that have addressed whether an entity qualifies in a "class

6  of workers" engaged in foreign or interstate commerce have found that an entity

7  does not qualify as a transportation worker.  *See R&C Oilfield Servs., LLC v. Am.*

8  *Wind Transp. Grp.*, 447 F. Supp. 3d 339, 347 (W.D. Pa. 2020) (finding

9  commercial contract between two entities "cannot reasonably be construed as a

10  contract of employment governing 'work by workers'"); *Carter O'Neal Logistics,*

11  *Inc. v. FedEx Ground Package Sys., Inc.*, 2020 WL 13111153, at *3 (W.D. Tenn.

12  Mar. 19, 2020) (noting *New Prime* "does not stand for the proposition" that the

13  exemption applies to corporate entities).

14       Plaintiffs contend that *Citizens United v. FEC*, 558 U.S. 310 (2010) provides

15  BDI with the same rights as individuals, and as a result, should qualify for the

16  exemption.  However, *Citizens United* is a First Amendment case that has no

17  apparent application to this case.  *See, e.g.*, *Fli-Lo Falcon, LLC v. Amazon.com*

18  *Inc.*, No. C22-441-RSM-MLP, 2022 WL 4451273, at *6 (W.D. Wash. Sept. 8,

19  2022).  Plaintiffs request a stay pending the Ninth Circuit's determination in *Fli-Lo*

20  *Falcon, LLC v. Amazon, Inc.*, Docket No. 22-35818.  However, the law is

ORDER GRANTING DEFENDANT'S MOTION TO COMPEL
ARBITRATION ~ 11

sufficiently clear from *New Prime* and its progeny that a stay is not warranted.

Here, the ISP Agreement was entered between two corporate entities in the business of fulfilling delivery orders. *See* ECF No. 1-2. BDI is not within a "class of worker" within the meaning of the Transportation Workers Exemption. *New Prime*, 139 S. Ct. at 541. Additionally, the ISP Agreement does not purport to cover the work of Mr. Randall as owner of BDI, nor are there any allegations in the Complaint that he is a transportation worker. *See* ECF No. 1-2. The Court concludes that the Transportation Worker Exemption does not apply to either Plaintiff. The Court concludes there is a valid agreement to arbitrate under the FAA. The Court declines to address the alternative argument applying the Pennsylvania Revised Uniform Arbitration Act.

**B.   Non-Signatory**

Plaintiffs assert that Mr. Randall's personal claims cannot be compelled to arbitration because he is not a party to any contract with FedEx. ECF No. 13 at 2–3. Defendant contends that Mr. Randall must arbitrate his individual claims under an equitable estoppel theory. *See* ECF No. 9 at 6–7.

The FAA "creates substantive federal law regarding the enforceability of arbitration agreements" but does not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). The parties

1   dispute what state law would apply but both Washington and Pennsylvania

2   recognize that a non-signatory may be bound by an arbitration provision under an

3   equitable estoppel theory.  *See Griswold v. Coventry First LLC*, 762 F.3d 264,

4   272–73 (3d Cir. 2014) (citing *Dodds v. Pulte Home Corp.*, 2006 PA Super 268,

5   909 A.2d 348 (2006)); *Townsend v. Quadrant Corp.*, 173 Wash. 2d 451, 461

6   (2012).

7       In Pennsylvania, non-signatories may be compelled to arbitrate "when there

8   is an obvious and close nexus between the non-signatories and the contract or the

9   contracting parties." *Dodds*, 909 A.2d at 351.  In Washington, non-signatories

10   may be compelled to arbitrate if the person claims "the benefits of a contract while

11   simultaneously attempting to avoid the burdens that contract imposes." *Townsend*,

12   173 Wash. 2d at 461.

13      Here, the alleged conduct has an obvious and close nexus to the contract

14   terms and Plaintiffs are seeking the benefits of the ISP Agreement.  *See* ECF No.

15   1-2.  The claims directly relate to FedEx's obligations and actions under the ISP

16   Agreement, including redefining BDI's Contracted Services Area and termination

17   of the ISP Agreement.  *See id.* at 11, ¶ 4.3.  Moreover, Plaintiffs seek damages that

18   include lost pay under the contract.  *Id.*, ¶ 4.4.  Finally, the Court notes BDI

19   already filed a AAA arbitration against FedEx, wherein Mr. Randall joined as a

20   nominal claimant, for claims of breach of contract and contingent discrimination

claims that are raised in this Complaint.  ECF No. 9 at 4–5.  Under these

circumstances, the Court finds that Mr. Randall is equitably estopped from

avoiding the arbitration provision under the ISP Agreement regardless of the

applicable state law.  Therefore, the Court compels Plaintiffs to arbitration in full.

Finally, the Court denies Defendant's Motion to Dismiss.

### C.  Stay

Under the FAA, the court should stay proceedings when an issue involved in

the lawsuit is subject to arbitration.  9 U.S.C. § 3.  However, the Ninth Circuit held

that a court has discretion to dismiss the action if all claims are arbitrable.

*Nagrampa v. MailCoups*, 469 F.3d 1257, 1276 (9th Cir. 2006) (en banc) (stating

the court "should stay or dismiss the action pending arbitration"); *Sparling v*

*Hoffman Constr. Co., Inc.*, 864 F.2d 635, 638 (9th Cir. 1988) (finding the district

court "acted within its discretion when it dismissed [the plaintiff's] claims").

The Court finds dismissal warranted where all issues will be determined by

an arbitrator.  No resources would be saved if the case were to remain on the

docket until arbitration concludes.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.  Defendant's Motion to Compel Arbitration (ECF No. 9) is **GRANTED**.

2.  Defendant's Motion to Dismiss (ECF No. 10) is **DENIED as moot**.

ORDER GRANTING DEFENDANT'S MOTION TO COMPEL
ARBITRATION ~ 14

1        3.  The Court **ORDERS** the parties to conduct arbitration pursuant to the

2             ISP Agreement.  This case is **DISMISSED**.

3        The District Court Executive is directed to enter this Order, furnish copies to

4    counsel, and **CLOSE** the file.

5        DATED July 19, 2023.



                              THOMAS O. RICE
                         United States District Judge

ORDER GRANTING DEFENDANT'S MOTION TO COMPEL
ARBITRATION ~ 15